UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUZANNE KOLLEY, et al.,

                  Plaintiffs,                Civil Case No.
                                         10-CV-11916

vs.

                                         HON. MARK A. GOLDSMITH

ADULT PROTECTIVE SERVICES, et al.,

                  Defendants.
_____/

## OPINION AND ORDER REGARDING DEFENDANTS' DISPOSITIVE MOTIONS

### I.      Introduction

       This is a constitutional civil rights and state tort case related to the actions allegedly taken by Defendants in removing Plaintiff Jena Kolley from her home and placing her in Hazel House group home. Before the Court are six separate motions filed by Defendants requesting dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), and/or judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), and/or summary judgment pursuant to Federal Rule of Civil Procedure 56.

### II.     Factual and Procedural Background

       Plaintiffs are:

- Jena Kolley;

- Suzanne and Joseph Kolley (the divorced biological parents of plaintiff Jena Kolley);

- George Brown (Suzanne Kolley's husband and Jena Kolley's step-father); and

- William and Joseph Kolley, Jr. (Jena Kolley's brothers).

       Defendants are:

- the Michigan Department of Human Services (MDHS), Michigan Adult Protective Services (APS), and APS agent Marcie Fincher;

- the Macomb-Oakland Regional Center (MORC)[1] and MORC agents Edward Kiefer, Lori Mathes, Susan Thomas, Lea Antella, and Susan Gipperich;

- Oakland County Sheriff's Detective John Neph;

- Hazel House group home,[2] Hazel House manager Priscilla Murrell, and Hazel House employee Pat Holmes;

- Shirley Saltzman, Jena Kolley's guardian ad litem; and

- Tricia Schuster, a forensic evaluator with Care House.[3]

The following account is taken from the allegations of the complaint.

Jena Kolley is a developmentally disabled nineteen-year-old woman who has a rare genetic disorder, Oral Facial Digital Syndrome, characterized by physical defects of the mouth, tongue, teeth, jaw, face, head, eyes, nose, fingers, and toes. D.E. 1 at ¶ 16 (complaint). Due to her condition, Jena Kolley's communication skills and social skills are significantly impaired. The complaint alleges that Jena Kolley's communication skills are that of a child between the ages of five and seven; her social skills are that of a child between four and eight. Id. at ¶ 19. By way of illustration, "when given a verbal prompt, Jena Kolley will use a 2 word utterance 80% of the time." Id. Jena Kolley does not communicate well with people with whom she is

---

[1] Defendant MORC is "a private, nonprofit, human services agency who provides support and respite care for children and adults with developmental and psychiatric disabilities. MORC contracts [with] and receives funding from local community mental health boards and authorities and the Michigan Department of Community Mental Health." D.E. 16 at 1 (MORC motion).

[2] Defendant Hazel House "is staffed with social workers/care givers who are responsible for the care of mentally and physically disabled residents who were placed by MORC as part of the probate court process." D.E. 33 at 2 (Hazel House motion).

[3] Care House is a private non-profit agency that performs forensic interviews on children for law enforcement in Oakland County. Molnar v. Care House, 574 F. Supp. 2d 772, 779 (E.D. Mich. 2008),

uncomfortable, is often misunderstood, and lacks the ability to correct the listener when she is misunderstood.   The complaint alleges that, when faced with a question, Jena Kolley often simply answers "yes."  Id.

Jena Kolley attended Rochester Public Schools until October 2008, when she began attending "Wings," a school for mentally disabled children.  On November 12, 2008, Oakland County Sheriff's Department Detective John Neph informed Suzanne Kolley that Jena Kolley's teacher at Wings reported that Jena Kolley told her on October 29, 2008 and November 6, 2008 that "mama hit me."  Id. at ¶ 23.  According to the complaint, when Suzanne Kolley arrived at school with Jena Kolley on November 14, 2008,

> Plaintiff Suzanne Kolley was approached by a school police liaison, [Jena Kolley's teacher] Stephanie Nelson, . . . Defendant Neph, [APS employee] Marcie Fincher, and an unknown APS employee who informed Plaintiff Suzanne Kolley that Plaintiff Jena Kolley would be questioned for a few hours[,] after which Jena could return home with her mother.  This upset Plaintiff Jena Kolley, who began to cry and cling to her mother.  At that point Plaintiff Suzanne Kolley showed the school social worker that Plaintiff Jena Kolley did not have any bruises on her back, yet these individuals persisted in taking the hysterically upset girl away from her mother to be questioned.
>
> Present at this interview were Defendant Marcie Fincher, Assistant Oakland County Prosecutor Derek Meinecke, Defendant Edward [Kiefer], Defendant Lori Mathes, Defendant Susan Thomas, Defendant Neph, and Defendant [Tricia] Schuster.
>
> Defendants subjected Plaintiff Jena Kolley to a variety of invasive and leading questions, despite the fact that Plaintiff Jena Kolley is not competent to make such statements.[4]
>
> As a result of these tactics, Defendants were able to take advantage of Plaintiff Jena Kolley's disability and convince her to make allegations against her mother, Plaintiff Suzanne Kolley.

Id. at ¶¶ 24-27.  Following the interview, Jena Kolley was permitted to return home with her mother.  The complaint alleges that, based solely on the statements made by Jena Kolley at the

---

[4] The complaint does not elaborate on what it means by "such statements."

interview, "Defendants" filed an ex parte petition to terminate Suzanne's guardianship over Jena Kolley.  Id. at ¶ 29.  Joseph Kolley, Jena Kolley's father, was allegedly not notified of the petition.

Later that same day, Detective Neph informed the Kolley family that Jena Kolley was going to be removed from the home.  Within an hour, MORC agent Defendant Susan Gipperich appeared at Jena Kolley's home with two Oakland County sheriff's deputies and removed Jena Kolley.  Suzanne Kolley informed Gipperich of Jena Kolley's strict dental and oral hygiene requirements.  Id. at ¶ 32-33.  From November 14 to November 18, the Kolley Family was allegedly not made aware of the location to which Jena Kolley had been taken.  On November 18, 2008, they were notified that the Oakland County Probate Court had appointed a temporary guardian in place of Suzanne Kolley.  Later, criminal charges were filed against Suzanne Kolley related to the abuse allegations by Defendants.  Id. at ¶ 47.

On November 18, 2008, Jena Kolley was allegedly transported to St. John Providence Hospital in Southfield, Michigan, by Detective Neph and Hazel House's Pat Holmes and subjected to an "anal and vaginal rape test."  Id. at ¶ 35.  The complaint alleges that the exam occurred "without any allegations whatsoever of rape," and that Jena Kolley was not competent to consent to the exam and Jena Kolley's temporary guardian did not sign the form.  According to the complaint, the hospital report showed no evidence of rape, abuse, or bruising.  Id. at ¶ 35.

No one from the Kolley family was permitted to visit Jena Kolley at Hazel House from November 18, 2008 to December 26, 2008.  During that time, Hazel House employees would cut short family members' phone calls to Jena Kolley because after the calls, Jena Kolley would cry for hours to see her family and go home.  On December 23, 2008, Joseph Kolley was allegedly

appointed by the Probate Court as a co-guardian, with rights of visitation.[5]  Plaintiffs allege that, as Jena Kolley's biological father, Joseph Kolley had the right to be appointed full guardian.  Id. at ¶¶ 36, 39.

On December 26, 2008, Joseph Kolley visited Jena Kolley at Hazel House.  He was allegedly the first family member permitted to visit Jena Kolley since she had been removed from the family home on November 14, 2008.  Joseph Kolley observed that Jena Kolley "had lost weight and appeared disheveled and dirty"; that Jena Kolley's finger and toe nails were long and untrimmed; that "Hazel House employees had allowed the hair to grow out on her face and legs"; and that her dental hygiene needs were not being met.  Id. at ¶ 40.  Joseph Kolley complained about his daughter's condition to Hazel House employees and repeated Jena Kolley's dental hygiene requirements.

On January 28, 2009, the probate court held a hearing related to Joseph Kolley's petition to receive full custody of Jena Kolley.  According to the complaint, "[b]efore and at this hearing, [Hazel House] Defendant Pri[sc]illa Mu[r]rell, Defendant Marcie Fincher, [guardian ad litem] Defendant Saltzman, and the MORC Defendants conspired and subsequently offered false testimony that on the December 26, 2008 [Hazel House] visit . . . Plaintiff Joseph Kolley made sexual connotations towards [Jena Kolley] and requested that Hazel House give [Jena Kolley] a 'bikini wax' or otherwise shave her pubic hair."  Id. at ¶ 43.

Also according to the complaint, after the hearing, William Kolley asked "how do you people sleep at night," causing Murrell to tell Jena Kolley "something to the effect of, 'if you don't stop crying you will never see your family again.'"  Id. at ¶ 44.  Plaintiffs allege that

---

[5] The other co-guardian at this point was the temporary guardian previously appointed by the probate court, a non-family member who was Shirley Saltzman's predecessor as guardian.

Joseph and William Kolley were denied access to Hazel House on January 28, 2009, which caused Jena Kolley to begin crying for them.

On January 29, 2009, the probate court granted an emergency motion to terminate the Kolley family's visitation rights. Plaintiffs allege that the motion was "based on the outlandish allegation that on January 28, [2009] William Kolley and Joseph Kolley threatened MORC and Hazel House employees at Oakland County Circuit Court and again at Hazel House." Id. at ¶ 46. Plaintiffs allege that, after the termination of Joseph Kolley's rights, no one from the Kolley family was permitted to visit or call Jena Kolley.

On March 11, 2009, Plaintiffs filed suit in federal district court, raising the same claims they raise in the instant suit (along with a medical malpractice claim). On October 16, 2009, United States District Judge George Caram Steeh dismissed the case without prejudice on Younger abstention grounds, due to then-pending state court proceedings involving Jena Kolley in Oakland County Probate Court and against Suzanne Kolley in Oakland County Circuit Court. See Kolley v. Adult Protection Servs., No. 09-CV-10919, 2009 WL 3388374 (E.D. Mich. Oct. 16, 2009).

On May 12, 2010, Plaintiffs filed the present suit. The complaint alleges that the state court matters "have since been resolved in favor of the family, and Plaintiff Jena Kolley has been returned to her family." D.E. 1 at ¶ 50. With regard to the criminal charges against Susanne Kolley, the complaint states that the charges "were subsequently dismissed upon a finding that the charges lacked evidence and lacked probable cause." Id. at ¶ 47. It also alleges that Jena Kolley experiences "continuing trauma and hallucinations" as a result of the above events, and has been diagnosed with post traumatic stress disorder. Id. at ¶ 51.

The complaint alleges that Defendants committed the following federal constitutional violations:

- Count I:  violation of Plaintiffs' First Amendment right to family association by removing Jena Kolley from her home (against all Defendants);

- Count II:  violation of Plaintiffs' right not to be deprived of their parental liberty interests without procedural and substantive due process of law (against Defendants MDHS, APS, Fincher, the MORC Defendants, and Detective Neph);

- Count III:  challenge to the Social Welfare Act of Michigan, Mich. Comp. Laws §400.111 et seq., as unconstitutionally overbroad and void for vagueness (against MDHS and APS); and

- Count IV:  violation of Plaintiffs' right to be free from discrimination based upon their Arab-American ethnicity (against all Defendants).

In addition, the complaint alleges the following state-law claims:

- Count V:  gross negligence for breaching duties established by the MDHS Adult Service Manual, Michigan statute, and common law (against APS and Fincher);

- Count VI:  negligence (against the MORC Defendants);

- Count VII:  battery related to Jena Kolley's rape examination (against Detective Neph and Defendant Holmes);

- Count VIII:  defamation related to the statements to the probate court implying Joseph Kolley had sexual contact with his daughter Jena Kolley (against Defendants Murrell, Saltzman, and a yet-to-be-identified Hazel House employee);

- Count IX:  false imprisonment for removing Jena Kolley from her home (against all Defendants);

- Count X:  abuse of process for failing to notify Joseph Kolley of the ex parte guardianship petition and related to the testimony given against the Kolleys in court (against Defendants MDHS, APS, Fincher, the MORC Defendants, Detective Neph, the Hazel House Defendants, and Saltzman); and

- Count XI:  intentional infliction of emotional distress (against all Defendants).

Plaintiffs seek a court order declaring portions of the Social Welfare Act of Michigan, Mich. Comp. Laws §400.111 et seq., unconstitutional and $15 million in compensatory and exemplary damages.

Currently pending are the following six motions filed by Defendants:

- motion to dismiss (or alternatively for summary judgment) by MORC and Edward Kiefer, Lori Mathes, Susan Thomas, Lea Antella, and Susan Gipperich (D.E. 16);

- motion to dismiss by Defendant Shirley Saltzman (D.E. 20);

- motion for judgment on the pleadings (or alternatively, for summary judgment) by Defendant Tricia Schuster (D.E. 27);

- motion to dismiss by Defendant John Neph (D.E. 31);

- motion for judgment on the pleadings (or alternatively for summary judgment) by Defendants Hazel House, Priscilla Murrell, and Pat Holmes (D.E. 33); and

- motion to dismiss (or alternatively for summary judgment) by Defendants MDHS and Marcie Fincher (D.E. 34).

These motions have been fully briefed.  On February 10, 2011, the Court held a motion hearing.

## III.   Discussion

This portion of the Court's Opinion is divided into four parts.  In part A, the Court sets out the standard of review.  In part B, the Court addresses the threshold issues of jurisdiction and collateral estoppel.  In part C, the Court addresses defects in the complaint.  In part D, the Court addresses other defenses.

### A.  Applicable Standards

In evaluating a motion to dismiss pursuant to Rule 12(b)(6),

[c]ourts "must construe the complaint in the light most favorable to plaintiff," League of United Latin Am. Citizens v. Bredesen, 500 F.3d 523, 527 (6th Cir. 2007) (citation omitted), "accept all well-pled factual allegations as true[,]" id., and determine whether the "complaint states a plausible claim for relief[,]"

8

> Ashcroft v. Iqbal, --- U.S. ----, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009).
> However, the plaintiff must provide the grounds for its entitlement to relief,
> Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 361 (6th Cir. 2001), and that
> "requires more than labels and conclusions, and a formulaic recitation of the
> elements of a cause of action." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555,
> 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). A plaintiff must "plead [ ] factual
> content that allows the court to draw the reasonable inference that the defendant is
> liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. A plaintiff falls
> short if she pleads facts "merely consistent with a defendant's liability" or if the
> alleged facts do not "permit the court to infer more than the mere possibility of
> misconduct . . . ." Id. at 1949, 1950.

Albrecht v. Treon, 617 F.3d 890, 893 (6th Cir. 2010) (first bracket added, all others in original).

Motions for judgment on the pleadings pursuant to Rule 12(c) are analyzed under the same standards. Id.

With the exception of Defendant Saltzman's and Defendant Neph's motions to dismiss, Defendants' motions to dismiss are alternatively submitted as motions for summary judgment. Significantly, all of Defendants' motions (including the Saltzman and Neph motions) present the Court with evidentiary exhibits outside of the pleadings. In their responses to Defendants' motions, Plaintiffs repeatedly argue that it would be inappropriate for this Court to rule on Defendants' summary judgment arguments as Plaintiffs have not had an opportunity for discovery. See, e.g., D.E. 21 at 6; D.E. 23 at 8; D.E. 40 at 7; D.E. 42 at 15; D.E. 47 at 18.

Under the circumstances presented here, the Court agrees with Plaintiffs. It is a well-established principle that "the plaintiff must receive 'a full opportunity to conduct discovery' to be able to successfully defeat a motion for summary judgment." Short v. Oaks Corr. Facility, 129 F. App'x 278, 281 (6th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986)). Thus, "[a] grant of summary judgment is improper if the non-movant is given an insufficient opportunity for discovery." White's Landing Fisheries, Inc. v. Buchholzer, 29 F.3d 229, 231-32 (6th Cir. 1994). Rule 56(d) provides a mechanism for plaintiffs to obtain sufficient

discovery prior to consideration of a summary judgment motion.  Short, 129 F. App'x at 281. Although a non-movant who wishes to have additional discovery must ordinarily file a Rule 56(d) affidavit (or a motion for additional discovery) explaining its need for discovery, the Sixth Circuit has concluded that the failure to do so is not fatal where the party otherwise explains its need for discovery to the district court.  Short, 129 F. App'x at 282 n.2; Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, 280 F.3d 619, 627-28 (6th Cir. 2002).

Although the parties are in possession of several documents related to the various state court proceedings, it appears the parties have not yet engaged in substantial discovery in this litigation.   After Plaintiffs re-filed their complaint in the current case, and the case was subsequently reassigned to the undersigned Judge, the parties met with this Court for a scheduling conference on October 25, 2010.  At that conference, Plaintiffs expressed their desire to pursue discovery; Defendants urged the Court to consider a round of dispositive motions before pursuing discovery.

Although the Court agreed to consider dispositive motions prior to the parties' conducting discovery, the Court is mindful that it agreed to do so over Plaintiffs' objection. Plaintiffs have, in the context of the specific summary judgment arguments against them, explained their need for discovery.  See, e.g., D.E. 21 at 5-7, 10-14.  Thus, at this stage in the proceedings, it would be premature for the Court to evaluate the incomplete body of evidence. Accordingly, in considering the current motions, the Court will exclude evidence outside of the pleadings, and will not consider arguments based on an alleged absence of disputed issues of fact.[6]

---

[6] The only extra-pleading materials the Court will consider are the orders issued by the state courts, of which this Court may take judicial notice.  Winget v. JP Morgan Chase Bank, 537 F.3d 565, 576 (6th Cir. 2008) ("on a motion to dismiss, we may take judicial notice of another court's

**B. Threshold Issues**[7]

**1. Rooker-Feldman**

Some Defendants argue that the Court lacks subject matter jurisdiction over this case under the <u>Rooker-Feldman</u> doctrine. In particular, Defendants argue that because Jena Kolley was removed from her home pursuant to an order of the Oakland County Probate Court, this Court would have to make the determination that the state court order was erroneous for Plaintiffs to prevail in this action. According to Defendants, this Court lacks the subject matter jurisdiction to make such a ruling because it would amount to collateral attack on a state court order in federal court. D.E. 31 at 14-15 (Neph motion); D.E. 34 at 7-8 (MDHS & Fincher motion).

The <u>Rooker-Feldman</u> doctrine, named after the Supreme Court cases <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413 (1923) and <u>District of Columbia Court of Appeals v. Feldman</u>, 460 U.S. 462 (1982), establishes a limit on federal subject-matter jurisdiction. Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4469.1 (2d ed. 2010). The doctrine "is based on the negative inference that, if appellate court review of . . . state court judgments is vested in the Supreme Court, then it follows that such review may not be had in the lower federal courts." <u>Lawrence v. Welch</u>, 531 F.3d 364, 368 (6th Cir. 2008) (citing <u>Exxon Mobile Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S. 280, 283-84 (2005)). Accordingly, the federal courts lack jurisdiction to hear "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings

---

opinion not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity").

[7] Although the <u>Rooker-Feldman</u> and collateral estoppel arguments are raised by fewer than all the Defendants, if the arguments are successful, the suit would be barred as to all Defendants.

commenced and inviting district court review and rejection of those judgments." Exxon, 544

U.S. at 284.  In determining whether to apply the doctrine, a Court must "distinguish[] between

plaintiffs who bring an impermissible attack on a state court judgment – situations in which

Rooker-Feldman applies – and plaintiffs who assert independent claims before the district court

– situations in which Rooker-Feldman does not apply." Lawrence, 531 F.3d at 368 (citations

omitted).

The Sixth Circuit has applied these principles in a pair of pertinent cases.  In McCormick

v. Braverman, 451 F.3d 382 (6th Cir. 2006), the state courts had issued judgments concerning

Mary and Edward McCormick's divorce and the proper owner of a piece of disputed marital real

property.  See id. at 385-87.  Mary McCormick's daughter then filed suit in federal court

alleging, inter alia, that the defendants had seized the property through fraud, false testimony,

and malicious and reckless acts.  Id. at 388.  The federal district court concluded that it lacked

subject matter jurisdiction under the Rooker-Feldman doctrine.  The Sixth Circuit disagreed:

> None of these claims assert an injury caused by the state court judgments;
> Plaintiff does not claim that the state court judgments themselves are
> unconstitutional or in violation of federal law. Instead, Plaintiff asserts
> independent claims that those state court judgments were procured by certain
> Defendants through fraud, misrepresentation, or other improper means[.]

Id. at 392.  The court concluded that the pertinent question is "whether the source of the injury

the plaintiff alleges . . . is the state court decision." McCormick, 451 F.3d at 393.  Because the

federal claims before the court "all assert[ed] injury from a source other than the state court

judgments," they were "independent claims outside the scope of the Rooker-Feldman doctrine.

Id. at 394.

In Pittman v. Cuyahoga County Dept. of Children and Family Servs., 241 F. App'x 285

(6th Cir. 2007) (unpublished), the Sixth Circuit applied McCormick's principles to claims quite

12

similar to those here.  In that case, the plaintiff-father had lost custody of his daughter when the state courts granted legal custody to the girl's great aunt and uncle.  The plaintiff alleged that the county department of children and family services violated his rights to family association and due process.  Id. at 286.  He contended that defendants "acted wantonly, recklessly, in bad faith, and with a malicious purpose by falsely representing information to the juvenile court."  Id. at 287.  The district court concluded that it lacked subject matter jurisdiction under the Rooker-Feldman doctrine.

Again, the Sixth Circuit rejected application of the Rooker-Feldman bar.  The court concluded that the plaintiff was not challenging the state court custody order, but rather was challenging the defendant family services organization's failure to make a recommendation in his favor.  Id. at 288.  The plaintiff did not seek to overturn the state court order, but rather sought a declaratory order that defendants' bad acts violated the Fourteenth Amendment, along with damages.  Under these circumstances, the court found that the source of the plaintiff's alleged injury was the defendants' activity, not the state court judgment.  Thus, the court concluded that the plaintiff was "asserting independent claims, which are not barred by Rooker-Feldman."  Id.

Applying these standards, the Court concludes that the source of injury upon which Plaintiffs base their claims is not the Oakland County Probate Court order removing Jena Kolley from the family home, nor the series of orders thereafter that did not immediately return Jena Kolley to the home.  Rather, the alleged source of Plaintiffs' injuries is the activity of Defendants themselves.  Plaintiffs do not claim that the state court orders are unconstitutional or otherwise violate state or federal law.  They allege that those orders were obtained due to fraudulent or

13

otherwise improper actions by Defendants.  McCormick and Pittman instruct that such claims are "independent claims," to which the Rooker-Feldman bar does not apply.

Accordingly, the Rooker-Feldman doctrine does not apply here to divest the Court of subject matter jurisdiction.[8]

### 2.  Collateral Estoppel

Defendants MDHS and Fincher advance a collateral estoppel argument, which the Court observes is less than clear.  Defendants do not explain precisely which issues currently before the Court they contend are precluded by prior state court litigation, which specific claims those issues relate to, and, in some cases, which prior state court proceeding is the subject of each preclusive bar.  Nevertheless, the Court proceeds using Defendants' own description of their collateral estoppel claims as a starting point for its analysis.

Defendants argue that collateral estoppel bars "the core of" Plaintiffs' claims.[9]  D.E. 34 at 9-11.  Defendants contend that the orders of the state courts, specifically the November 14, 2008 probate court order concluding that there were reasonable grounds to remove Jena Kolley from

---

[8] The Court notes that this result is consistent with Judge Steeh's previous conclusion on this same issue.  See Kolley, 2009 WL 3388374 at **6-7, which the Court finds persuasive, but not binding, as argued by Plaintiffs.  To the extent that Plaintiffs argue that Judge Steeh's rejection of the Rooker-Feldman argument when this matter was before him means that this Court is collaterally estopped from considering the same argument, the Court rejects this assertion.  Although Judge Steeh rejected Defendant Neph's Rooker-Feldman argument and concluded that the court was not deprived of jurisdiction, the resolution of the issue was not "necessary and essential" to his judgment of dismissal, which was based on Younger abstention grounds.  Because the "necessary and essential" element for collateral estoppel is not satisfied as to Judge Steeh's rejection of the Rooker-Feldman argument, see Wolfe v. Perry, 412 F.3d 707, 716 (6th Cir. 2005), collateral estoppel does not bar this Court's independent evaluation of that issue.

[9] Based on Defendants' brief, "the core of" Plaintiffs' claims refers to the following claims: violation of right to family association and unity (count I), denial of due process (count II), discrimination (count IV), and abuse of process (count X).  D.E. 34 at 11.

her home,[10] along with subsequent "similar findings" by the probate court when it continued Jena Kolley's foster care placement and made Joseph Kolley Jena Kolley's co-guardian, resolved the issues of "reasonable cause, probable cause, custody, care and supervision of Jena."  D.E. 34 at 10.  Defendants argue that thus "the issues relevant to [Plaintiffs'] federal claims were actually litigated and determined by the state court in the child protection proceedings."  Id.  Defendants also posit that "another layer of estoppel" is established by the fact that Suzanne Kolley (prior to having the abuse charges against her dropped) was bound over for trial, demonstrating that the state court had determined there was probable cause for Suzanne Kolley's abuse charges.[11]  Id. at 11.  Plaintiffs respond that they are not challenging the rulings of either the state probate court or criminal court.  D.E. 40 at 16 (Plaintiffs' response to MDHS/Fincher motion).  In their reply, MDHS and Fincher retreat from the broader argument made in their initial brief and clarify that they rely on the fact that "the state court concluded [that there existed] probable cause to believe Jena was the victim of abuse in her home."  D.E. 52 at 4.  Correspondingly, they base their entitlement to collateral estoppel on the assertion that "[p]robable cause is a material fact to both the First Amendment and due process claims asserted here."  Id.

In the context of evaluating the preclusive effect of a state court decision, the Sixth Circuit has explained:

> The Full Faith and Credit Act, 28 U.S.C. § 1738, requires the federal courts to give state court judgments the same preclusive effect that the state would afford such judgments.  Exxon Mobil, 125 S. Ct. at 1527 (quoting Parsons Steel, Inc. v. First Alabama Bank, 474 U.S. 518, 523, 106 S. Ct. 768, 88 L .Ed. 2d 877 (1986)).  Michigan has three requirements for collateral estoppel:  "(1) 'a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment'; (2) 'the same parties must have had a full [and fair]

_____

[10] See D.E. 16-8 (11/14/08 probate court order appointing guardian).

[11] See D.E. 34-8 (preliminary hearing transcript).

> opportunity to litigate the issue'; and (3) 'there must be mutuality of estoppel.'"
> Monat v. State Farm Ins. Co., 469 Mich. 679, 677 N.W.2d 843, 845-46 (2004).

McCormick, 451 F.3d at 397 (citation omitted).  The third requirement does not apply where, as here, collateral estoppel is being used "defensively."  Gilbert v. Ferry, 413 F.3d 578, 581 (6th Cir. 2005).

In McCormick, 451 F.3d at 398 & n.14, the Sixth Circuit applied these principles to conclude that collateral estoppel barred the plaintiff's claims because a factual predicate of her claims was that she had an ownership interest in a particular property, yet the state courts had previously ruled that she had no interest in the property.  The same analysis applies here.  Accordingly, the key issue is whether the absence of probable cause is a material fact to Plaintiffs' First Amendment and due process claims.

As a preliminary matter, Defendants do not argue why "probable cause" is material to Plaintiffs' claims for family association and unity, denial of due process, discrimination, and abuse of process.  They merely assert the point, without argument or citation to authority.  This oversight might be excusable, should the claims in question have the absence of probable cause as a necessary element.[12]  However, the elements of Plaintiffs' claims do not reference probable cause, leaving Defendants' assertion without substantiation.

In addition, the use of the term "probable cause" in reference to the various state court determinations is imprecise and confusing.  Although the state court decision to bind Suzanne Kolley over for trial on the abuse claims reflects a finding of probable cause, see People v. Orzame, 570 N.W.2d 118, 121 (Mich. Ct. App. 2009), in their reply brief, Defendants relied instead on the probate court order removing Jena Kolley from the home and appointing a

---

[12] For example, a §1983 false arrest claim "requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff."  Sykes v. Anderson, 625 F.3d 294, 305 (6th Cir. 2010).

temporary guardian for her as the "probable cause" determination.  <u>See</u> D.E. 52 at 4.  This order (which does not use the terminology "probable cause") reflects the judge's finding that Jena Kolley "is an individual with a developmental disability and requires guardianship services." D.E. 16-8 (11/14/08 probate court order removing Jena Kolley and appointing temporary guardian).  However, it is not clear from the order <u>why</u> the court concluded that Jena Kolley required "guardianship services," only that she did.[13]  This order, without more, certainly does not establish (as Defendants claim) that the state court concluded there was "probable cause to believe Jena was the victim of abuse in her home."

Regardless, even assuming that "probable cause" (or a more proper characterization of the state court's finding) is material to Plaintiffs' claims, the fact that Plaintiffs allege that false information was provided as the basis for the state court's determinations means that collateral estoppel does not apply.  In <u>Molnar v. Care House</u>, 574 F. Supp. 2d 772 (E.D. Mich. 2008), the plaintiff-father brought a §1983 action against various defendants related to their investigation of his daughter's allegations of his criminal sexual misconduct.  The defendants argued that Molnar was collaterally estopped from pursuing an unlawful arrest claim in federal court because the state court had ruled on the issue of probable cause.  The <u>Molnar</u> court observed that the claim would not necessarily be precluded:

> There are, however, occasions where a finding of probable cause in a state court preliminary hearing will not preclude a plaintiff from litigating a federal claim in federal court.  When a plaintiff alleges a police officer acted in bad faith, provided false information, or misstated material facts in order to establish probable cause, collateral estoppel will not apply.  <u>Taylor v. City of Detroit</u>, 368 F. Supp. 2d 676 (E.D. Mich. 2005) (collateral estoppel will not apply to finding of probable cause at preliminary examination if plaintiff's false arrest claim under § 1983 is based upon officer supplying false information); <u>Buttino v. City of Hamtramck</u>, 87 [F. App'x] 499, 504 (6th Cir. 2004) (action alleging bad faith by

---

[13] The only memorialization of the state court's determination presented to this Court was the state court order.  The order itself does not explain the factual underpinnings of its conclusions.

police officer challenges integrity of evidence rather than sufficiency of evidence); Darrah v. City of Oak Park, 255 F.3d 301, 311 [(6th Cir. 2001)] (holding that the state court's determination of probable cause at the preliminary hearing was not identical to the issue of whether Officer Bragg made materially false statements to the state judge that formed the basis of the probable cause determination[]).

Id. at 791.

Although Molnar applied this principle in the false arrest context, it makes sense to apply it in the instant case as well. As stated above, one of the prerequisites to applying collateral estoppel is that the party against whom the doctrine is asserted must have had a full and fair opportunity to litigate the issue. If a defendant allegedly provided the state court with false information, it would undermine a plaintiff's "fair opportunity" to litigate the issue. The Sixth Circuit has implicitly acknowledged this principle outside of the false arrest context. In McCormick (as explained above), the court found plaintiff's claims precluded because the factual predicate of her claims was that she had an ownership interest in a particular property, yet the state courts had previously ruled that she had no interest in the property. In reaching its conclusion, however, the McCormick court took care to note that, despite the fact that the plaintiff had alleged fraud and misrepresentation by the defendants in some state court proceedings, the plaintiff had not alleged fraud or misrepresentation with respect to the state court proceeding in which the court decided the issue of ownership interest in the property. McCormick, 451 F.3d at 398 & n.12. Accordingly, there was no reason to doubt that the plaintiff had had a "full and fair opportunity" to litigate the key issue in state court, and collateral estoppel was appropriate.

Here, in contrast to McCormick, Plaintiffs' allegations of false testimony by Defendants permeate the relevant state court determinations. Plaintiffs allege that Jena Kolley was misled by Defendants into making (false) accusations against her mother. Plaintiffs also allege that several

Defendants gave the probate court false testimony concerning Joseph Kolley. Accordingly, state court findings that were based upon those allegedly infirm facts will not preclude consideration of the claims now before the Court. For these reasons, the Court rejects Defendants' collateral estoppel argument.

### C. Defects in Complaint

#### 1. Federal Claims

##### a. Right of Family Association and Right to Due Process

Several Defendants raised the issue whether Plaintiffs have properly alleged the deprivation of a constitutionally protected right with regard to Count I (violation of Plaintiffs' First Amendment right to family association) and Count II (violation of Plaintiffs' right to due process). The Court examines the complaint's allegations on these counts for compliance with the requirements of <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937 (2009) and <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007).

In order to analyze the complaint's allegations in these counts, the Court first examines the relevant legal landscape. As the Sixth Circuit has explained, where the state removes a child from parental custody, the stage is set for the clash between the state's "compelling" interest in protecting children from abuse and the qualified right to family association:

> [T]he right to family integrity, while critically important, is neither absolute nor unqualified. <u>Martinez v. Mafchir</u>, 35 F.3d 1486, 1490 (10th Cir. 1994). The right is limited by an equaling compelling governmental interest in the protection of children, particularly where the children need to be protected from their own parents. <u>Myers v. Morris</u>, 810 F.2d 1437, 1462 (8th Cir. 1987). Governmental entities have a "traditional and transcendent interest" in protecting children within their jurisdiction from abuse. <u>Maryland v. Craig</u>, 497 U.S. 836, 855, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990); <u>see also</u>, <u>New York v. Ferber</u>, 458 U.S. 747, 757, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982) (stating that "the prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance"). Thus, "although parents enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the

compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is necessary as against the parents themselves." Wilkinson, 182 F.3d at 104.

Kottmyer v. Maas, 436 F.3d 684, 690 (6th Cir. 2006).[14]   Further, in the context of a child being removed from parental custody by the state, the right to family integrity requires that the state act in a manner consistent with due process:

> [C]ourts have concluded that a parent's liberty interest in familial association is implicated where a child is removed from his or her parent's care and custody. Thus, a state agent must provide sufficient due process before terminating parental rights, see Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982), or before removing a child from his or her parent's custody, see Ram v. Rubin, 118 F.3d 1306, 1310 (9th Cir. 1997) (stating that a parent cannot be summarily deprived of custody of his or her child without notice and a hearing, except when the child is in imminent danger).  These courts rely on the proposition that the constitution guarantees "that parents will not be separated from their children without due process of law except in emergencies."  Mabe v. San Bernardino County, Department of Public Social Services, 237 F.3d 1101, 1107 (9th Cir. 2001) (citing Stanley v. Illinois, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)).

Id. at 690-91.

Turning to the allegations contained in the complaint, in Count I, Plaintiffs allege, in pertinent part:

> Defendants did not have a sufficiently compelling interest to eject Plaintiff Jena Kolley from her home. . . . whatever interest the Defendants may have had could have been achieved through means significantly less restrictive of associational freedoms.

D.E. 1 at ¶ 55.  In Count II, Plaintiffs allege, in pertinent part:

> That Defendants[] had a duty to Plaintiffs to provide sufficient due process before removing Plaintiff Jena Kolley from her parent[s'] care and custody.  Defendants failed to provide a clear and effective procedure in ensuring that Plaintiff Suzanne Kolley's and Plaintiff Joseph Kolley's parental interest in their child was not

---

[14] The fact that Jena Kolley was an adult at the time of the relevant events may also impact Plaintiffs' entitlement to relief on the family association claim.  See, e.g., Jones v. Rhode Island, 724 F. Supp. 25, 33 (D.R.I. 1989) (dismissing §1983 claim for alleged deprivation of First Amendment right to continued family association where plaintiffs' relative was an adult child).

unduly obstructed, including but not limited to, failing to notify biological father Plaintiff Joseph Kolley.

That . . . the Defendants['] improper conduct further violated [Plaintiffs'] substantive due process right to familial integrity."

D.E. 1 at ¶¶ 60-61 (complaint).

With regard to Count I, the complaint is defective in several respects. As a preliminary matter, Count I (violation of the First Amendment right to family association and unity) is not alleged as a §1983 claim. Because §1983 is the vehicle by which a plaintiff may impose liability for constitutional injuries committed by individuals acting under color of state law, Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel, 570 F.3d 520, 525 (3d Cir. 2009), Plaintiffs have not stated a claim. To the extent that Plaintiffs do intend to allege a §1983 claim in Count I, the Court construes the allegations to be a substantive due process claim. See Herndon v. Chapel Hill-Carrboro City Bd. of Educ., 89 F.3d 174, 177 (4th Cir. 1996) (explaining that parents were alleging a substantive due process claim where they contended that the school district was required to demonstrate a compelling interest and that its actions were narrowly tailored to advance that interest in the manner least restrictive of the parents' rights). However, the allegations fail to state a claim. To the extent Plaintiffs allege that there was no compelling interest in removing Jena Kolley from her home, such an allegation flies in the face of Kottmyer, which makes clear that in circumstances of suspected abuse, the parents' right to family association is limited by the government's "compelling" interest in the protection of the children. See Kottmyer, 436 F.3d at 690. Further, Plaintiffs' allegations that less restrictive means could have been employed is merely a legal conclusion without any supporting facts – a violation of the pleading standard required under the federal rules. In re Sofamor Danek Group, Inc., 123

F.3d 394, 400 (6th Cir. 1997). Accordingly, the allegations in Count I fail to state a claim for violation of the right to family association.

Turning to Count II, specifically the complaint's procedural due process allegations, the Court finds them lacking. Apart from the single concrete allegation that Defendants "fail[ed] to notify biological father Plaintiff Joseph Kolley," it is unclear precisely what other actions by Defendants allegedly violated Plaintiffs' due process rights. In addition, Plaintiffs have not stated a procedural due process claim as to any individual Defendant. See Foote v. Spiegel, 118 F.3d 1416, 1423 (10th Cir. 1997) ("Individual liability under §1983 must be based on personal involvement in the alleged constitutional violation."); Moorer v. Booker, No. 09-13725, 2010 WL 5090111 at *1 (E.D. Mich. Aug. 31, 2010) ("In order to state a claim for monetary damages under § 1983, Plaintiffs must allege some specific, personal wrongdoing on the part of each individual defendant."). Even assuming some sort of procedural due process deficiency related to "notify[ing]" Joseph Kolley, it is not clear which of Defendants, if any, had any duty to notify Joseph Kolley of the petition or of Jena Kolley's removal. Nor is it clear that any Defendants had a duty to obtaining the Kolleys' participation in the initial hearing. The complaint does not allege that any particular Defendant did.

With regard to Count II's substantive due process allegations, the Court again finds the pleading insufficient. The lone allegation referencing substantive due process – that "the Defendants['] improper conduct further violated [Plaintiffs'] substantive due process right to familial integrity" – is conclusory. The allegation cites Defendants' "improper conduct," but does not specify what conduct of Defendants' allegedly violated Plaintiffs' substantive due process rights. Plaintiffs may have intended for the factual allegations contained in the "Factual Background" section of the complaint to lend additional substance to this claim. However, even

if this were the case, it is not clear which factual allegations apply to which legal claims. This Court could only speculate as to which allegations apply to which claims. The necessity of such speculation, of course, itself indicates an insufficient complaint. See Bell Atlantic, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

Further, even if the Court were to speculate as to which factual allegations pair with which legal claims – for example, that the assertion that "Defendants were able to take advantage of Plaintiff Jena Kolley's disability and convince her to make allegations against her mother" (id. at ¶ 27) alleges a violation of Plaintiffs' substantive due process – the allegations are woefully under-explained. It is not clear what type of "allegations" Jena Kolley allegedly made against her mother. The complaint leaves unclear whether Defendants allegedly "[took] advantage" of Jena Kolley's disability only through the technique of "invasive and leading questions" referenced earlier in the complaint or whether Defendants allegedly used other tactics to take advantage of Jena Kolley's deficits. Id. at ¶¶ 26-27. With regard to the allegation that "Defendants subjected Plaintiff Jena Kolley to a variety of invasive and leading questions," id. at ¶ 26, it is unclear whether the complaint is asserting that each Defendant interviewed Jena Kolley. The significance of this overbroad and generalized pleading is that individual Defendants have insufficient notice of the legal claims they face and the actions they are alleged to have taken.[15] See Bell Atlantic, 550 U.S. at 555 (defendants entitled to be given "fair notice of what the . . . claim is and the grounds upon which it rests") (quoting Conley v. Gibson, 355 U.S. 41, 47 (1975)). In addition, this lack of clarity in Plaintiffs' substantive due process

---

[15] The Court recognizes that Plaintiffs have not had a full opportunity to conduct discovery, and thus may not have a full factual picture of the events described in the complaint. However, the Court notes that Plaintiffs themselves have described the above events differently and in more detail in subsequent filings with this Court. Accordingly, it is clear that the lack of factual clarity in the complaint is not wholly due to the lack of information.

allegations is particularly deficient, given the significant showing required for a substantive due process claim.[16]

Accordingly, Plaintiffs have failed to sufficiently plead a violation of constitutional rights with regard to the family association and due process claims (Counts I and II of the complaint). The claims are dismissed without prejudice to Plaintiffs filing an amended complaint within 30 days of the date of entry of this Opinion.

### b.  Ethnic Discrimination

Count IV of the complaint brings a 42 U.S.C. §1983 claim alleging discrimination against Plaintiffs based on their Arab-American ethnicity.  The legal basis of this claim is not clear.  The complaint does not explicitly mention any substantive federal law or constitutional provision.  It does cite §1983, but §1983 on its own does not create substantive rights.  Sample v. Bailey, 409 F.3d 689, 695 (6th Cir. 2005) (§1983 "does not create any substantive rights but rather merely provides remedies for deprivations of rights established elsewhere").

Construing the complaint generously, Plaintiffs appear to be bringing this claim against Defendants based on a Fourteenth Amendment equal protection theory.  To show an equal protection violation, Plaintiffs must show that Defendants deliberately discriminated against them based on their ethnicity.  See Washington v. Davis, 426 U.S. 229, 239-40 (1976).  That is, Plaintiffs must show discriminatory intent on the part of Defendants; they must show that

---

[16] A government official violates substantive due process rights when his or her actions "shock the conscience."  County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998); Claybrook v. Birchwell, 199 F.3d 350, 359 (6th Cir. 2000).  Only deliberate or reckless conduct falls into this category.  Smith v. Williams-Ash, 173 F. App'x. 363, 366 (6th Cir. 2005) (unpublished).  When an official had time to deliberate various alternative courses of action, the requisite standard of culpability is "deliberate indifference" towards the plaintiff's protected rights.  Claybrook, 199 F.3d at 359.  Because of the lack of clarity in Plaintiffs' substantive due process allegations, it cannot be said that Plaintiffs have sufficiently pled a plausible claim for relief that might meet these stringent standards.

Defendants "selected a particular course of action at least in part 'because of,' not merely 'in spite of,' its [racial] effects."  Wilson v. Collins, 517 F.3d 421, 432 (6th Cir. 2008) (quoting Hernandez v. New York, 500 U.S. 352, 360 (1991)).

All Defendants argue that Plaintiffs' allegations in Count IV fail to state a claim.  Several make the argument that the complaint fails to make sufficient allegations under the standard announced by the Supreme Court in Iqbal, 129 S. Ct. at 1949.

The Court agrees.  Even construing the complaint generously, the allegations of race discrimination are so conclusory and insubstantial that they do not satisfy Iqbal's requirements. As explained above, after Iqbal, courts considering a motion to dismiss "must construe the complaint in the light most favorable to plaintiff, accept all well-pled factual allegations as true, and determine whether the complaint states a plausible claim for relief."  Albrecht, 617 F.3d at 893 (citations and quotations omitted).  The complaint here does not meet that standard because it alleges, in an entirely conclusory manner, that Defendants committed illegal discrimination. The complaint speaks in unacceptably general terms and offers no facts that would support a claim of discriminatory animus.  D.E. 1 at ¶ 77 ("The above-described actions and allegations of Defendants were motivated by racial animus because Plaintiff Suzanna Kolley, Plaintiff Jena Kolley, Plaintiff William Kolley, and Plaintiff Joseph Kolley Jr., are Arab-Americans.")  This is not enough.  See Iqbal, 129 S. Ct. at 1949 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); Bell Atlantic, 550 U.S. at 555 (explaining that the Court now "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action").

Accordingly, the ethnic discrimination claim (Count IV of the complaint) is dismissed as to all Defendants. This dismissal is without prejudice to Plaintiffs filing an amended complaint within 30 days of the date of entry of this order.

### 2. State-Law Claims[17]

Similarly, Plaintiffs fail to state a claim with regard to several state-law claims. For the reasons stated below, the Court will dismiss these claims without prejudice to Plaintiffs filing an amended complaint within 30 days of the date of entry of this Opinion.

### a. Battery

The complaint alleges:

> On November 18, 2008 Defendant Neph and Defendant Holmes intentionally and willfully escorted Plaintiff Jena Kolley to St. John Providence Hospital in Southfield, Michigan.

> Defendant Neph and Defendant Holmes, intended to, and did so subject Plaintiff Jena Kolley to an anal and vaginal rape test.

> The anal and vaginal rape test involved the harmful and offensive contact of Plaintiff Jena Kolley's person.

> Plaintiff Jena Kolley was not competent to consent to this contact, nor was consent provided by her guardian.

> As a direct and proximate result of the harmful and offensive contact, Plaintiff Jena Kolley was made to suffer damages, including, but not limited to: pain, suffering, humiliation, embarrassment, and emotional distress.

> Plaintiff Jena Kolley was taken by Defendant Neph and Pat Holmes to St. John Providence Hospital in Southfield, Michigan for an anal and vaginal rape test. As a ward of the state Plaintiff Jena Kolley was not competent to consent to this exam, nor did her appointed guardian sign the consent. Despite this misstep,

---

[17] The Court notes that should Plaintiffs fail to properly re-plead a violation of constitutional rights with regard to the federal claims, the Court, in its discretion, may choose not to exercise supplemental jurisdiction over the remaining state-law claims. See Robert N. Clemens Trust v. Morgan Stanley DW, Inc., 485 F.3d 840, 853 (6th Cir. 2007) (affirming district court's decision not to exercise supplemental jurisdiction over state-law claims after it had dismissed federal claims).

> Defendant Neph and Pat Holmes subjected Plaintiff Jena Kolley, a girl with the functional equivalency of a young child, to an extremely invasive, humiliating and degrading test without any allegations of rape whatsoever.

D.E. 1 at ¶ 92-97.

To prevail on a battery claim under Michigan law, Plaintiffs must demonstrate a "wilful and harmful or offensive touching of another person which results from an act intended to cause such a contact." VanVorous v. Burmeister, 687 N.W.2d 132, 142 (Mich. Ct. App. 2004). Plaintiffs' allegations, shocking as they are, do not contend that any Defendants (the battery claim is made against Defendants Neph and Holmes) touched Jena Kolley, an element of the tort. Although Plaintiffs argue that a Defendant's physical presence was not required to make out a battery claim, the authorities they cite do not pertain to the tort of battery. See D.E. 42 at 21 (making the argument as to Defendant Neph). Because no apposite authority has been offered to support Plaintiffs' novel understanding, the Court concludes that Plaintiffs have failed to state a claim. Defendants Neph and Holmes (the only Defendants against whom the claim is alleged) are entitled to dismissal of Count VII, the battery count. As stated above, this dismissal is without prejudice.

### b.  False Imprisonment

As the Michigan Court of Appeals has observed, the "general concept of false imprisonment" is that it is an "unlawful restraint of an individual's personal liberty." Moore v. City of Detroit, 652 N.W.2d 688, 690 (Mich. Ct. App. 2002). The elements of false imprisonment are "'[1] an act committed with the intention of confining another, [2] the act directly or indirectly results in such confinement, and [3] the person confined is conscious of his confinement.'" Id. at 691 (quoting Adams v. Nat'l Bank of Detroit, 508 N.W.2d 464, 469 (Mich. 1993)).

27

The complaint's central false-imprisonment allegation is that Jena Kolley was restrained by Defendant Gipperich when Gipperich physically removed Jena Kolley from her home and placed her into a foster home.  D.E. 1 at ¶ 107.  The complaint also alleges that Oakland County sheriff's deputies accompanied Defendant Gipperich, providing a threat of force.  Id. at ¶ 109.  The complaint's false-imprisonment allegations do not allege any specific acts by Defendants other than Gipperich.  The only allegation that applies to the other Defendants is the statement that "[t]he other Defendants['] conduct [described elsewhere in the complaint] amounts to knowing and [willful] participation in the false imprisonment."  Considering the three-prong standard above, the allegations of the complaint do not suffice to state a claim as to most Defendants.  The single broad allegation that could conceivably be understood to apply to the non-Gipperich Defendants fails to allege the intent of each of those Defendants (and what act each committed with that intent), as required.

Accordingly, the false-imprisonment claim, Count IX, should be dismissed as to all Defendants on this basis, except as to Defendant Gipperich.  As stated above, this dismissal is without prejudice.

### c.  Intentional Infliction of Emotional Distress

The Michigan courts have explained the standard governing a claim for intentional infliction of emotional distress:

> The tort of intentional infliction of emotional distress has four elements:
> (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and
> (4) severe emotional distress.  Roberts v. Auto-Owners Ins. Co., 422 Mich. 594,
> 602, 374 N.W.2d 905 (1985); Johnson v. Wayne Co., 213 Mich. App. 143, 161,
> 540 N.W.2d 66 (1995).  Liability for such a claim has been found only where the
> conduct complained of has been so outrageous in character, and so extreme in
> degree, as to go beyond all possible bounds of decency and to be regarded as
> atrocious and utterly intolerable in a civilized community.  Id. at 161, 540 N.W.2d
> 66.

Haverbush v. Powelson, 551 N.W.2d 206, 209 (Mich. Ct. App. 1996). The "intent or recklessness" requirement refers to the intention of inflicting emotional distress, rather than merely intending the action that caused the distress. Id. at 210.

Plaintiffs raise this claim against all Defendants. The complaint simply asserts that Defendants' conduct described elsewhere in the complaint was the direct and proximate cause of extreme mental and emotional distress to "the Plaintiff," presumably Jena Kolley. Without more specific allegations, the Court is at a loss to understand which of the actions specifically – and by which Defendants – form the basis of this tort in Plaintiffs' view. The allegations concerning Jena Kolley allegedly being subjected to an unnecessary vaginal and anal examination might be the type of allegations that could meet the Haverbush standard. However, the complaint's description of this event does not include any allegation about Defendants' intent, as required by Haverbush. Accordingly the claim for intentional infliction of emotional distress (Count XI) is dismissed without prejudice for failure to state a claim.

### D.  Other Defenses Pertaining to Individual Defendants/Groups of Defendants

Because the Court will allow Plaintiffs to re-plead their complaint, despite the claims above being insufficient under Iqbal and Twombly, it remains relevant whether certain individual Defendants (or groups of Defendants) are entitled to dismissal based on immunity or some other legal ground. The Court will next address such arguments and determine whether certain defenses require a dismissal with prejudice as to particular Defendants.[18]

---

[18] The Court will not address questions of federal qualified immunity, which require a determination whether Plaintiffs have stated a claim, see Cooper v. Parrish, 203 F.3d 937, 951 (6th Cir. 2000), a determination that might be altered by any future amended complaint by Plaintiffs

## 1. Defendant Saltzman

Defendant Shirley Saltzman, Jena Kolley's guardian ad litem, claims that she is entitled to dismissal of the claims against her because, inter alia, as a guardian ad litem, she is entitled to absolute immunity for all federal and state-law claims.  For the reasons set forth below, the Court agrees that Saltzman is immune and is entitled to dismissal of the claims against her with prejudice.

### a. Absolute (Quasi-judicial) Immunity

Salzman argues that, as a guardian ad litem, she is entitled to quasi-judicial immunity with regard to the §1983 claims.

In Kurzawa v. Mueller, 732 F.2d 1456 (6th Cir. 1984), the Sixth Circuit concluded that a guardian ad litem, as a person "integral" to "the judicial process," was entitled to absolute immunity from the plaintiff's §1983 claims.  The court explained:

> Baldwin[,] who functioned as guardian ad litem for Cass Kurzawa, must act in the best interests of the child he represents.  Such a position clearly places him squarely within the judicial process to accomplish that goal.  A guardian ad litem must also be able to function without the worry of possible later harassment and intimidation from dissatisfied parents. Consequently, a grant of absolute immunity would be appropriate.  A failure to grant immunity would hamper the duties of a guardian ad litem in his role as advocate for the child in judicial proceedings.

Id. at 1458.  Kurzawa is consistent with numerous other circuit court decisions, all standing for the proposition that guardians ad litem are entitled to absolute quasi-judicial immunity for performing job duties that are a part of the judicial process.  See, e.g., Gardner v. Parson, 874 F.2d 131, 146 (3d Cir. 1989) ("We would agree that a guardian should be absolutely immune when acting as an integral part[ ] of the judicial process.") (internal quotation marks omitted); Dornheim v. Sholes, 430 F.3d 919, 925 (8th Cir. 2005) (same); Cok v. Consentino, 876 F.2d 1, 3 (1st Cir. 1989) (same); See Fleming v. Asbill, 42 F.3d 886, 889 (4th Cir. 1994) (because all of

guardian ad litem's actions "occurred within the judicial process," guardian ad litem entitled to absolute immunity).

Here, Saltzman was appointed guardian ad litem pursuant to the probate court's order. Michigan law describes the guardian ad litem duties of informing the court of the guardian's determinations with regard to the guardianship of an individual and drafting a report. <u>See</u> Mich. Comp. Laws §700.5305(e). The allegations against Saltzman concern her court-ordered testimony and recommendations. Accordingly, the actions complained of were an integral part of the judicial process and Saltzman is entitled to absolute immunity.[19] The §1983 claims against her will be dismissed with prejudice.

### b. Immunity under Michigan Law

Concerning Saltzman's state-law immunity argument, under Michigan law, "[a] guardian ad litem is immune from civil liability for an injury to a person or damage to property if he or she is acting within the scope of his or her authority as guardian ad litem." Mich. Comp. Laws §691.1407(6). Defendants qualifying for immunity under this statute are entitled to Rule 12(b)(6) dismissal. <u>See</u> <u>Thomas v. City of Detroit</u>, 299 F. App'x 473, 477-78 (6th Cir. 2008) (upholding district court's grant of motion to dismiss based upon defendant's claim of immunity under the Michigan governmental immunity statute).

Plaintiffs can be understood to be making two arguments in response: first, that governmental immunity is not available as a defense to an intentional tort, and second, that

---

[19]The fact that the complaint alleges that Saltzman "conspired" with others regarding the testimony does not affect her entitlement to immunity. <u>See</u> <u>Cok</u>, 876 F.2d at 3 (allegations of malice, bad faith, or conspiracy do not defeat guardian ad litem immunity for actions taken pursuant to court order); <u>Safouane v. Fleck</u>, 226 F. App'x. 753, 762 (9th Cir. 2007) ("An allegation of conspiracy to affect the outcome does not defeat the immunity."). Likewise, the fact that the complaint alleges that her testimony was false does not affect her entitlement to immunity. <u>See Fleming v. Asbill</u>, 42 F.3d at 889 (noting that guardian at litem would have been immune from §1983 liability even if she had lied to the judge in court).

Saltzman was not acting within the scope of her authority as guardian ad litem. The Court rejects these arguments.

As to the first argument, it is the case that the provision of the Michigan immunity statute that applies to officers and employees of governmental agencies – Mich. Comp. Laws §691.1407(2) – does not apply to intentional torts. <u>See</u> <u>Odom v. Wayne Cty.</u>, 760 N.W.2d 217, 223-24 (Mich. 2008). As the Michigan Supreme Court has explained, the statute makes clear its intent to limit its immunity to non-intentional torts in Mich. Comp. Laws §691.1407(3), which states that "[s]ubsection (2) does not alter the law of intentional torts as it existed before July 7, 1986." <u>See</u> <u>Odom</u>, 760 N.W.2d at 223. However, a different provision of the statute – Mich. Comp. Laws §691.1407(6), applying in particular to guardians ad litem – applies to Saltzman. And no similar limiting language applies to the guardian ad litem provision. <u>See</u> Mich. Comp. Laws §691.1407(6). Thus, there is no basis for concluding that guardian ad litem immunity does not apply to intentional torts. Further, the language of the provision that applies to judges, legislators, and high executive officials, Mich. Comp. Laws §691.1407(5), is nearly identical to the guardian at litem provision. <u>Compare</u> Mich. Comp. Laws §691.1407(5) <u>and</u> Mich. Comp. Laws §691.1407(6). And the Michigan Court of Appeals has concluded that the immunity provided by Mich. Comp. Laws §691.1407(5) does apply to intentional torts. <u>Nicklas v. Koelling</u>, Nos 248870 & 248871, 2004 WL 2808904 at *1 (Mich. Ct. App. 2004) (citing <u>Armstrong v. Ypsilanti Charter Twp.</u>, 640 N.W.2d 321, 594 (Mich. Ct. App. 2001)).

As to Plaintiffs' second argument – that Saltzman was not acting within the scope of her authority as guardian ad litem – the Court agrees with Saltzman that all of the acts alleged in the complaint were committed when she was acting within the scope of her authority as guardian ad

litem.  The complaint alleges that Saltzman defamed Plaintiff Joseph Kolley when at the January

28, 2009 probate hearing in Oakland County Circuit Court, she did the following:

- "falsely republished the defamatory statements [that Joseph Kolley had requested that the Hazel House employees give his daughter a "bikini wax" "or otherwise have her pubic hair shaved"] to the Court and further defamed Plaintiff Joseph Kolley by making statements and implications at the hearing that Plaintiff Joseph Kolley had engaged in illegal sexual conduct with his daughter"; and

- "re-published these statements to the court and others present at the January 28, 2009 hearing with knowledge of the falsity of the statements or at least negligence for their truth or falsity."

D.E. 1 at ¶¶ 102-03.  The complaint also alleges that Saltzman committed an abuse of process

by:

- giving the "bikini wax" testimony to the Oakland County Circuit Court as described above; and

- her "recommendation and implication that Plaintiff Joseph Kolley's residence was not a safe and secure environment for Plaintiff [Jena] Kolley, and the further recommendation that a psychological evaluation be conducted on Joseph Kolley to determine his suitability as custodian for his daughter."

D.E. 1 at ¶¶ 115c-d.  The complaint's allegations all concern the statutorily required testimony

that Saltzman gave in her capacity as a guardian ad litem.[20]  Such actions are clearly within the

scope of her authority.  The fact that the complaint alleges that Saltzman acted with bad faith or

malice in the course of performing her guardian ad litem duties does not change the result.  See,

e.g., Armstrong v. Ypsilanti Charter Twp., 640 N.W.2d 321, 333 (Mich. Ct. App. 2001) ("The

fact that Armstrong alleged that defendants committed intentional torts, and that they had an

---

[20] The Court notes that the complaint contains the general allegation that "Defendants" failed to notify Joseph Kolley of the petition that was filed with the probate court to remove Jena from the home and terminate the guardianship of Suzanne Kolley.  See D.E. 1 at ¶ 60 & ¶115a.  However, this allegation cannot be directed at Defendant Saltzman.  The probate court hearing concerning the petition occurred on November 14, 2008.  See D.E. 16-8.  But Saltzman was not even appointed Jena Kolley's guardian ad litem until the following December.  See Kolley, 2009 WL 3388374 at *5 (order appointing Saltzman was entered on December 18, 2008).

improper motive and purpose in eliminating his position along with an unlawful intent, is meaningless . . . as we have held, defendants were acting within the scope of their statutory authority in eliminating that position.").[21]

Accordingly, Saltzman is entitled to immunity pursuant to Mich. Comp. Laws §691.1407(5), and the state-law claims against her will be dismissed with prejudice.

### 2. Defendant Neph

Oakland County Sheriff's Detective John Neph argues, <u>inter alia</u>, that (i) the federal claims against him in his "official capacity" are actually claims against Oakland County and must be dismissed, and (ii) he is entitled to dismissal of the claim for abuse of process. The Court agrees.

---

[21] Kolley claims that <u>Bullock v. Huster</u>, 554 N.W.2d 47 (Mich. Ct. App. 1996), dictates a different result. In <u>Bullock</u>, the court, evaluating a guardian ad litem's claim of immunity, concluded:

> Therefore, with regard to plaintiff's claims that defendant acted in a negligent or grossly negligent manner while performing her duties as guardian ad litem, defendant is immune from liability for those acts . . . . However, because plaintiff also raises claims of breach of express and implied contract and intentional misconduct, we remand this matter to the trial court for a determination whether the complained-of acts were committed when defendant was acting within the scope of her authority as guardian ad litem and whether defendant may be held liable for those acts.

<u>Id.</u> at 49. <u>Bullock</u> does not change the analysis in this case. The <u>Bullock</u> decision does not explain what acts the defendant had allegedly committed; apparently it was unclear whether such acts fell within the scope of a guardian ad litem's authority. In contrast, here Saltzman's acts were core guardian ad litem duties. Nor does the <u>Bullock</u> court's remand of claims of "intentional misconduct" dictate mean that Saltzman is not entitled to immunity for the intentional torts alleged in this case. Decided in 1996, immediately after the guardian ad litem provision was added to the statute, <u>Bullock</u> predated the Michigan Court of Appeals' determination that the immunity covering judges, legislators and executive officials applies even to intentional torts. <u>See</u> <u>Nicklas,</u> 2004 WL 2808904, at *1; <u>Armstrong</u>, 640 N.W.2d at 594.

###### a.   Claims Against Neph in His "Official Capacity

Defendant Neph argues that the claims against him in his official capacity are actually claims against Oakland County, which must be dismissed under <u>Monell v. New York City Dep't. of Social Servs.</u>, 436 U.S. 658 (1978).  D.E. 31 at 13-14.

Defendant Neph fails to specify what claims were alleged against him in his official capacity.  Upon review of the complaint, the Court observes that no such claims were made against him.  In addition, any claim alleged against Defendant Neph in his official capacity would function as a claim against Oakland County, <u>see</u> <u>Cady v. Arenac County</u>, 574 F.3d 334, 342 (6th Cir. 2009), and Plaintiff's counsel confirmed at the motion hearing that Plaintiffs are not suing the County.[22]

Accordingly, the Court finds that the complaint has alleged no claims against Defendant Neph in his official capacity.  If Plaintiffs wish to assert such a claim for the first time, they must file a motion to amend the complaint under the federal rules.  <u>See</u> Fed. R. Civ. P. 15.

###### b.  Abuse of Process

With regard to Plaintiffs' abuse-of-process claim, Neph argues that the complaint does not allege any actions taken by Defendant Neph.  The Michigan Supreme Court has explained the tort of abuse of process in the following way:

> A meritorious claim of abuse of process contemplates a situation where the defendant has availed himself of a proper legal procedure for a purpose collateral to the intended use of that procedure, e.g., where the defendant utilizes discovery in a manner consistent with the rules of procedure, but for the improper purpose of imposing an added burden and expense on the opposing party in an effort to conclude the litigation on favorable terms.

---

[22] Despite the fact that Oakland County is listed as a defendant on the docket, the County is not a party in this case.  The complaint does not list the County as a defendant, nor does it make any allegations specific to the County.

Vallance v. Brewbaker, 411 N.W.2d 808, 810 (Mich. 1987). To plead an abuse-of-process claim, a plaintiff must plead (i) an ulterior purpose and (ii) an act in the use of process that is improper in the regular prosecution of the proceeding. Bonner v. Chicago Title Ins. Co., 487 N.W.2d 807, 812 (Mich. Ct. App. 1992).

Turning to the complaint, although it does include Defendant Neph in a list of Defendants who allegedly "abused the probate court process . . . with the ulterior motive of divesting [Jena Kolley's parents] as lawful and rightful guardians of Plaintiff Jena Kolley," it does not allege (in contrast to the other listed Defendants) that Defendant Neph committed *any* specific actions related to abuse of process. D.E. 1 at ¶ 115-18. More specifically, the complaint contains five paragraphs listing the actions by Defendants that allegedly constitute an abuse of process. Id. at ¶ 115a-e. Four out of five of those paragraphs attribute the actions to Defendants other than Neph. See id. at ¶ 115b-e. The other paragraph does not expressly identify Defendant Neph or any other Defendant as having committed the action in question. See id. at ¶ 115a. With regard to the allegation in this last paragraph – that Joseph Kolley was not notified of the petition to terminate guardianship of Suzanne Kolley – the complaint fails to allege a claim against Neph specifically, as is required. See Foote, 118 F.3d at 1423; Moorer, 2010 WL 5090111 at *1. Further, the claim does not allege that Neph had any duties relating to notifying Joseph Kolley of the petition.

Accordingly, the complaint does not state an abuse-of-process claim (Count X) as to Defendant Neph. This claim is dismissed without prejudice to Plaintiffs filing an amended complaint within 30 days of the date of entry of this Opinion.

### 3.   MORC Defendants

Apart from the arguments addressed in Part III.C, the MORC Defendants make four arguments in their motion to dismiss and/or for summary judgment.  First, they claim that they could not have been the "proximate cause" of Plaintiffs' constitutional injuries because they did not participate in the guardianship and visitation proceedings that form the basis of Plaintiffs' claims for family unity (Count I) and due process (Count II).  D.E. 16 at 7-9.  Second, they argue that they are not state actors for purposes of Plaintiffs' §1983 claims.  Id. at 9-13.  Third, they contend that, as social workers, they are entitled to absolute immunity on Plaintiffs' §1983 claims.  Id. at 14-15.  Fourth, they claim that as social workers, they are entitled to absolute immunity under Michigan law.  Id. at 15-19.

### a.   Proximate Cause of Plaintiffs' Injuries

The MORC Defendants argue that the right to family integrity does not include a constitutional right to be free from mere investigations of child abuse.  They contend that they merely participated in the investigation by being present at Jena Kolley's interview at Care House (Defendants Kiefer, Mathes, and Thomas only) and attending the probate court's guardianship hearing (Defendant Mathes only).   They contend that because no MORC Defendants "participate[d] in the very actions, [i.e.,] the guardianship and visitation proceedings upon which Plaintiffs[] have based their claimed Constitutional violations," they were not the proximate cause of any constitutional violations.  Id. at 9.

Defendants' argument is problematic in at least two ways.  First, as this Court previously concluded in its Rooker-Feldman analysis, construing the complaint favorably, the source of Plaintiffs' alleged injuries is not the probate court orders concerning guardianship or visitation, but the independent actions of Defendants.  These alleged actions include, with regard to the

MORC Defendants, their invasive and misleading interview of Jena Kolley causing her to "make allegations against her mother," and conspiring with other Defendants and offering false testimony to the probate court that Joseph Kolley requested a bikini wax for Jena Kolley. D.E. 1 at ¶¶ 26-27, 43. Further, even if the probate court orders could be understood to be the proximate cause of Plaintiffs' injuries, an exception applies where the court issuing the order is provided (as alleged here) falsified information by a defendant. See Molnar, 574 F. Supp. 2d at 786 (citing Sutkiewicz v. Monroe County Sheriff, 110 F.3d 352 (6th Cir. 1997) (although "the proximate cause of a plaintiff's injury for false imprisonment would ordinarily be the court order committing him to the psychiatric facility," "situations involving the presentation of false evidence or the withholding of evidence are exceptions to the general rule that . . . a court order breaks the chain of causation.")).

Second, MORC's defense depends upon facts that are not alleged in, and are contrary to, the complaint. According to the complaint, Defendants Kiefer, Mathes, and Thomas subjected Jena Kolley to questioning at Care House. D.E. 1 at ¶ 26. And "the MORC Defendants" conspired and offered the false testimony concerning the bikini wax. D.E. 1 at ¶ 43. Although the evidence may not substantiate these allegations, at this point, the Court accepts the complaint as true.

Accordingly, the MORC Defendants' proximate cause argument does not provide a basis for dismissal.

### b.   MORC Defendants as State Actors

The MORC Defendants claim that MORC is not a state actor. D.E. 16 at 9-13. In order to recover under 42 U.S.C. §1983, a plaintiff must prove both (i) that some person has deprived

him of a federal right, and (ii) that the person has done so under color of state law.  Adickes v.

S.H. Kress & Co., 398 U.S. 144, 150 (1970).

In the Sixth Circuit, a plaintiff must satisfy one of three tests to show that a defendant is a

state actor:  (i) the public function test, (ii) the state compulsion test, or (iii) the symbiotic

relationship or nexus test.  See Chapman, 319 F.3d at 833.  The Sixth Circuit has described these

tests as follows:

> Under the public function test, a private party is a state actor if he exercises
> powers traditionally reserved exclusively to the state.  Chapman, 319 F.3d at 833.
> "The public function test has been interpreted narrowly.  Only functions like
> holding elections, exercising eminent domain, and operating a company-owned
> town, fall under this category of state action." Id.  (citations omitted).
>
> . . .
>
> "The state compulsion test requires that a state 'exercise such coercive power or
> provide such significant encouragement, either overt or covert, that in law the
> choice of the private actor is deemed to be that of the state.'"  Lansing v. City of
> Memphis, 202 F.3d 821, 829 (6th Cir. 2000) (quoting Wolotsky v. Huhn, 960
> F.2d 1331, 1335 (6th Cir. 1992)).
>
> . . .
>
> "Under the nexus test, the action of a private party constitutes state action when
> there is a sufficiently close nexus between the state and the challenged action of
> the regulated entity so that the action of the latter may be fairly treated as that of
> the state itself."  S.H.A.R.K. v. Metro Parks Serving Summit Co., 499 F.3d 553,
> 565 (6th Cir. 2007) (citation and quotation omitted). The Supreme Court has
> found state action based on "pervasive entwinement" between a private actor and
> the state.  Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n, 531
> U.S. 288, 291, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001).

Reguli v. Guffee, 371 F. App'x 590, 600-01 (6th Cir. 2010) (unpublished).

A recent case in the Eastern District of Michigan, Molnar v. Care House, 574 F. Supp. 2d

772, considered the state actor issue under strikingly similar circumstances to those here.  The

Molnar court considered whether Care House, a private non-profit agency that performs forensic

interviews on children for law enforcement in Oakland County, was a state actor for §1983

purposes.  In <u>Molnar</u>, an employee of Care House conducted an interview of a minor child regarding abuse allegations.  <u>Id.</u> at 780.  The plaintiff, a parent of the interviewed child, claimed a violation of due process as a result of the investigation and, in particular, the defendant's interview.

The <u>Molnar</u> court considered the three tests.  The court concluded that the defendant failed to meet the public function test because, "[t]hough governments traditionally perform investigations and 'forensic interviews,' those acts have not been exclusively within the power of the state."  <u>Id.</u> at 784.  The court concluded that the defendant failed to meet the state compulsion test because the receipt of public funds or government referrals alone is not dispositive, and there was no evidence that state employees or agencies influenced Care House's day-to-day activities. <u>Id.</u> at 784-85.  The court concluded that the defendant failed to meet the symbiotic relationship or nexus test because there were few to no "indicia of state involvement which may transform private conduct into state action."  <u>Id.</u> at 785.  With regard to the third test, the court noted the type of evidence that might serve as "relevant indicia of state involvement":  "a clear connection between the police and the private investigation; completion of the private act at the instigation of the police; close supervision of the private conduct by the police; and a private act undertaken on behalf of the police to further a police objective."  <u>Id.</u> at 785 (citation omitted).  The <u>Molnar</u> court relied upon the following facts to conclude that Care House did not meet the standard:

> Here, although the Troy police referred [the minor child] to Care House, there is no evidence of record suggesting that the police or the prosecutor's office supervised, directed or otherwise participated in her interview.  While it is true that the authorities were able to observe the interview, they did not participate in the questioning.  And, once [the Care House employee] completed her interview of [the child], her role in this matter -- and Care House's role, as well -- ended.

<u>Id.</u> at 785-86.

While the role of MORC in this case is in some ways quite analogous to the role of Care House in Molnar, there are significant differences. According to the complaint, Defendant Neph, an officer with the Oakland County Sheriff's Department, participated in Jena Kolley's interview along with MORC Defendants Kiefer, Mathes, and Thomas. D.E. 1 ¶¶ 26-28. In addition, MORC Defendant Gipperich, along with two armed Oakland County sheriff's deputies, actually removed Jena Kolley from her home. D.E. 1 at ¶35. Accordingly, at this stage, the Court cannot conclude that MORC is not a state actor for purposes of this suit. The MORC Defendants are not entitled to dismissal on this basis.

### c. MORC Defendants' Entitlement to Absolute Immunity for Federal Claims

Alternatively, the MORC Defendants claim that they are entitled to absolute immunity because of their roles as social workers in this matter.

The Sixth Circuit has held that social workers are entitled to absolute immunity "under certain circumstances." Holloway v. Brush, 220 F.3d 767, 774 (6th Cir. 2000) (en banc). The Circuit's cases have defined the scope of absolute immunity for social workers by analogizing to prosecutorial immunity. Id. Prosecutors are absolutely immune "only for actions that are connected with the prosecutor's role in judicial proceedings"; they are not immune when they perform "administrative, investigative, or other functions." Id. at 775. As Holloway explains:

> The analytical key to prosecutorial immunity, therefore, is advocacy -- whether the actions in question are those of an advocate. By analogy, social workers are absolutely immune only when they are acting in their capacity as legal advocates -- initiating court actions or testifying under oath -- not when they are performing administrative, investigative, or other functions. The case before us turns on whether the actions of which [the plaintiff] complains were taken by [the social worker] in her capacity as a legal advocate.

Id.

41

Accordingly, social workers who "initiate judicial proceedings against those suspected of child abuse" or who otherwise function "in roles intimately associated with the judicial phase of proceedings" receive absolute immunity.  Rippy ex rel. Rippy v. Hattaway, 270 F.3d 416, 421 (6th Cir. 2001).  However, a social worker functioning essentially in an "investigatory" role is not entitled to absolute immunity, and receives only qualified immunity.  See Achterhof v. Selvaggio, 886 F.2d 826, 830 (6th Cir. 1989).  Further, it is not sufficient that a social worker was "an integral part of the judicial process at other stages" in the proceedings.  See Holloway, 220 F.3d at 777.  Rather, it is essential for a court to examine the specific actions that the social worker was alleged to have taken, and to determine whether they were taken while the social worker was functioning as a legal advocate.  See id. (noting that "[t]he question is whether the prosecutors have carried their burden of establishing that they were functioning as 'advocates'… when they performed the actions complained of," and concluding that social worker not entitled to absolute social worker immunity for "out-of-court" actions taken while she was not actively functioning as a court advocate) (citation omitted); Rippy, 270 F.3d at 422-23 (where juvenile court had removed child from parents' home, social worker acting in an advisory role to the court in recommending whether the child is ready to return home is absolutely immune); Thomas v. St. Vincent & Sarah Fisher Ctr., No. 03-73002, 2006 WL 2418974, at *6 (E.D. Mich. Aug. 21, 2006) (unpublished) (social worker not immune for supervision of child that was "part of routine monitoring to assure that the state was upholding its duty to provide a safe environment for him" and not part of a "judicial function" "to assist the court in deciding the best interests of [the child]").

In light of this standard, the Court cannot conclude at this point that Plaintiffs' §1983 claims against the MORC Defendants are barred on the basis of absolute immunity.  The lack of

clarity of the factual allegations concerning the §1983 claims against Defendants prevents the Court from fully ascertaining "all of the actions that underlie the [Kolleys'] claim," a necessary first step in the analysis.  See Rippy, 270 F.3d at 421-22.  Accordingly, the Court cannot at this time dismiss the §1983 claims against the MORC Defendants based on absolute immunity.[23]

### d.  Immunity under Michigan Law for State-Law Claims

The MORC Defendants argue that, as social workers, they are entitled to absolute immunity under Michigan law.  D.E. 16 at 15-19.  This is the only defense claimed by the MORC Defendants with regard to the state-law claims.

"Social workers are granted absolute immunity from civil litigation arising out of their work as 'advisors and agents' of the probate court."  Beauford v. Lewis, 711 N.W.2d 783, 786 (Mich. Ct. App. 2005).  The seminal Michigan case relating to social worker immunity is Martin v. Children's Aid Soc'y, 544 N.W.2d 651 (Mich. Ct. App. 1996).  In Martin, the plaintiffs' infant daughter was removed from their custody by the Department of Social Services.  Id. at 653.  The Department placed the child with Children's Aid Society (CAS), an entity that had a contract with the Department to provide services to neglected and abused children, and CAS placed the child in a foster home.  Id.  Several years later, the plaintiffs regained custody of their daughter and sued various defendants including CAS.  Id. at 653-54.

The Martin court concluded that CAS was entitled to absolute immunity.  The court noted that social workers play an important role in court proceedings "to determine when to

---

[23] While the Court is prevented from making a ruling on immunity due to Plaintiffs' failure to plead sufficiently, the Court notes that some of the complaint's allegations concern the MORC Defendants testifying before the probate court.  Such actions are certainly taken in Defendants' capacity as legal advocates, and would trigger absolute immunity.  If Plaintiffs file an amended complaint, they should be guided by this observation.

remove a child from the home and how long to maintain the child in foster care."  Martin, 544 N.W.2d at 655.  The court also observed that

> [p]rofessional assistance to the Probate Court is critical to its ability to make informed, life deciding judgments relating to its continuing jurisdiction over abused children.  Its advisors and agents cannot be subject to potential suits by persons[] aggrieved by the Court's decision vindictively seeking revenge against the Court's assistant as surrogates for the jurist.

Id. at 655-56.  Importantly, the court recognized that the plaintiffs were not without a remedy regarding the alleged conduct of CAS because, inter alia, the probate court "regularly reviewed the placement recommendation of the CAS defendants at statutorily required hearings," providing sufficient judicial oversight to protect plaintiffs.  Id. at 656.  The Martin court noted that its decision was "limited to the facts of this case, in which the close oversight of the social worker's placement recommendations by the probate court is especially noteworthy."  Id. at 655 n.5.  A subsequent decision has clarified that the "close oversight" requirement does not mean that the court must closely monitor the social worker's conduct during the investigation and oversee every discrete act of the social worker.  Beauford, 711 N.W.2d at 785.  The requirement is met, for example, where a court, in the course of overseeing parental right termination proceedings, reviews the social worker's findings and determinations.  Id. at 786.

The Court concludes that the MORC Defendants are entitled to social worker immunity as to Plaintiffs' abuse-of-process claim.  The allegations as to this claim involve the MORC Defendants' role as an advisor or agent of the court, as Plaintiffs effectively concede.[24]  The allegations concern (i) the filing of a petition requesting appointment of a guardian for Jena Kolley and (ii) the testimony of various Defendants before the Oakland County Circuit Court

---

[24] In response to Defendants' motion claiming entitlement to social worker immunity, Plaintiffs' argument attempting to defeat immunity expressly excludes the abuse-of-process claim.  See D.E. 21 at 19-20 & n.12.

related to Plaintiff Joseph Kolley's alleged "bikini wax" statements.  D.E. 1 at 19-20 (Count X, abuse of process).  Setting aside the fact that the allegations do not cite any specific actions by any MORC Defendants, the allegations all describe direct communications with the state court concerning the welfare of Jena Kolley.  They easily qualify as the actions of a court advisor or agent.

With regard to the other three state-law claims alleged against the MORC Defendants – negligence (Count VI), false imprisonment (Count IX), and intentional infliction of emotional distress (Count XI) – it is not appropriate to conclude that Defendants are immune at this time.

With regard to the claims for false imprisonment and intentional infliction of emotional distress, as described earlier in this Opinion, Plaintiffs failed to sufficiently plead these claims. This lack of clarity about the precise allegations for these claims prevents the Court from being able to conclusively determine the MORC Defendants' alleged role.  Accordingly, at this point, Defendants are necessarily prevented from establishing their right to immunity.  Cf. Thomas v. St. Vincent & Sarah Fisher Ctr., No. 03-73002, 2006 WL 2418974 at *9 (E.D. Mich. 2006) (unpublished) (premature to determine state-law immunity issue on a Rule 12(c) judgment-on-the-pleadings motion where issues of fact would need to be resolved to determine whether standard was met).

With regard to the negligence claim, although this claim was not the subject of a pleading deficiency determination in a prior part of this Opinion, this Court still requires additional factual development in order to make a determination on the question of immunity.  In particular, the relationship between the MORC Defendants' investigation (and specifically the alleged failings) and the judicial process needs to be clarified before this Court could evaluate whether the alleged negligent actions arose out of Defendants' work as "advisors and agents" of the state court.  At

this stage in the proceedings, the Court cannot evaluate the MORC Defendants' immunity related to the negligence claim.  See id.

Accordingly, the MORC Defendants are entitled to social worker immunity on the claim for abuse of process (Count X), and this claim will be dismissed as to them with prejudice.  The claims for negligence (Count VI), false imprisonment (Count IX), and intentional infliction of emotional distress (Count XI) will not be dismissed as to the MORC Defendants on this ground.

### 4.  Michigan Department of Human Services and Marci Fincher[25]

Apart from the arguments addressed in Parts III.B and III.C of this Opinion, MDHS and Fincher make three arguments in their motion to dismiss and/or for summary judgment that merit discussion here:  (i) the Court lacks jurisdiction under the Eleventh Amendment, (ii) Defendant Fincher is entitled to absolute social worker immunity as to both federal and state claims, and (iii) MDHS is entitled to governmental immunity under Michigan statute.

### a.  Eleventh Amendment Immunity

The Eleventh Amendment generally bars a suit for money damages brought in federal court against a state unless the state has waived its sovereign immunity or consented to be sued. See Kovacevich v. Kent State Univ., 224 F.3d 806, 817 (6th Cir. 2000).  This sovereign immunity extends to "state instrumentalities," like the Michigan Department of Human Services. See Regents of Univ. of Cal. v. Doe, 519 U.S. 425, 429 (1997).  In addition, state officials who are sued in their official capacities are also entitled to immunity because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," which is "no different from a suit against the State."  Will v. Mich. Dep't of

---

[25] Although the complaint lists Adult Protective Services (APS) as a separate defendant and agency of the State of Michigan, the Michigan Attorney General explains that APS is a program within the Michigan Department of Human Services, and not a stand-alone entity.  D.E. 34 at 2 n.1 (MDHS motion).

State Police, 491 U.S. 58, 71 (1989).  Accordingly, because the State of Michigan has not consented to be sued here, Plaintiffs' §1983 claims against the MDHC and against Fincher in her official capacity[26] – Count I (family association), Count II (due process), and Count IV (ethnic discrimination) – are dismissed.

In addition, Plaintiffs raise a federal constitutional claim that is not for money damages in Count III, a vagueness and overbreadth challenge to the Social Welfare Act of Michigan, Mich. Comp. Laws §400.111 et seq., for which Plaintiffs seek declaratory relief.  See D.E. 1 at 21. Such claims may be brought against an official sued in his or her official capacity.  See Thiokol Corp. v. Dept of Treasury, 987 F.2d 376, 381 (6th Cir. 1993) (Eleventh Amendment "does not preclude actions against state officials sued in their official capacity for prospective injunctive or declaratory relief") (citing Ex Parte Young, 209 U.S. 123 (1908).)  However, Marcie Fincher (in her official capacity or otherwise) is not a defendant as to Count III; the complaint cites only MDHS.  See D.E. 1 at 11-12.  Accordingly, Defendants are entitled to immunity on Count III. See Thiokol, 987 F.2d at 381 (Eleventh Amendment immunity "bars all suits, whether for injunctive, declaratory or monetary relief against the state and its departments").

### b.  Defendant Fincher and Absolute Social Worker Immunity

Defendant Fincher argues that she is entitled to absolute immunity for both federal and state-law claims on the basis of her role as a social worker.  D.E. 34 at 11-12.

The Court's analysis of social-worker immunity with regard to the MORC Defendants in Parts III.D.3.c and III.D.3.d is applicable here.  With regard to the federal claims, again, social workers who "initiate judicial proceedings against those suspected of child abuse" or who

---

[26] The complaint does not clarify at any point whether MDHS Defendant Marcie Fincher is being sued in her official or individual capacity.  To the extent the complaint can be construed as raising a claim against Fincher in her official capacity, this section resolves these claims in Fincher's favor.

otherwise function "in roles intimately associated with the judicial phase of proceedings" receive absolute immunity.  Rippy, 270 F.3d at 421.  However, a social worker functioning essentially in an "investigatory" role or in some other non-legal-advocate role, is not entitled to absolute immunity, and receives only qualified immunity.  See Holloway, 220 F.3d at 777; Achterhof, 886 F.2d at 830.

The complaint makes the same §1983 allegations against Fincher as it does against the MORC Defendants.  Thus, the analysis in Part III.D.3.c relating to the MORC Defendants applies to Fincher as well.  As with the MORC Defendants, the lack of clarity in the factual allegations concerning the §1983 claims against Fincher prevents the Court from ascertaining the specific actions that the social worker was alleged to have taken that support the claim, a necessary first step in the analysis.  See Holloway, 220 F.3d at 777; Rippy, 270 F.3d at 421-22.  Accordingly, at this stage, the Court cannot dismiss the §1983 claims against Defendant Fincher based on absolute social worker immunity.[27]

With regard to absolute social worker immunity relating to the state claims, the state-law social-worker immunity analysis in Part III.D.3.d of this Opinion applies to Fincher as well.  Again, "[s]ocial workers are granted absolute immunity from civil litigation arising out of their work as 'advisors and agents' of the probate court."  Beauford, 711 N.W.2d at 786.

With regard to the abuse-of-process claim, as the Court explained in Part III.D.3.d of this Opinion, all of the complaint allegations describe direct communications with the state court concerning the welfare of Jena Kolley, easily qualifying as the actions of a court advisor or

---

[27] As the Court noted with regard to the MORC Defendants, some of the complaint's allegations concern Defendant Fincher testifying before the probate court.  Although the Court is prevented from ruling on the immunity issue due to the lack of clarity regarding the §1983 allegations, it notes that Fincher would be entitled to absolute immunity against any §1983 claim based upon such actions, which were clearly taken in Fincher's capacity as a legal advocate.

agent.  Accordingly, like the MORC Defendants, Fincher is entitled to social worker immunity as to that claim.

There are three other state-law claims alleged against Defendant Fincher – gross negligence (Count V), false imprisonment (Count IX), and intentional infliction of emotional distress (Count XI).  With regard to the claims for false imprisonment and intentional infliction of emotional distress, as the Court concluded as to the MORC Defendants, because of the lack of clarity of the allegations in these counts, the Court cannot conclude that Fincher is immune at this time.  Similarly, with regard to the gross-negligence claim, at this stage in the proceedings, the relationship between the alleged grossly negligent actions and the judicial process is not clear enough to make a determination whether the actions arose out of Defendants' work as "advisors and agents" of the state court.[28]  Thus, the Court cannot evaluate Fincher's entitlement to immunity related to the gross negligence claim.

Accordingly, Defendant Fincher is entitled to social worker immunity on the claim for abuse of process (Count X), and this claim will be dismissed as to her with prejudice.  The claims for gross negligence (Count V), false imprisonment (Count IX), and intentional infliction of emotional distress (Count XI) will not be dismissed as to Fincher on this ground.

---

[28] Specifically as to gross negligence, the complaint asserts that Fincher breached her duties to Plaintiffs by, inter alia, (i) "Relying upon information solicited from a person that Defendants knew or should have reasonably known was incompetent to provide accurate testimony," (ii) "Initiating legal intervention without first determining that the alleged damage could not be eliminated through the use of social intervention, or in the alternative fail[ing] to become reasonably apprised of the facts necessary to make an informed decision," (iii) "Instituting involuntary legal intervention despite the fact that there was no risk of serious harm to Plaintiff Jena Kolley," (iv) "Determining that personal management of Plaintiff Jena Kolley was appropriate notwithstanding that even with the flawed evidence before Defendant Fincher, [] there was no threat of death or serious physical harm," and (v) "Petitioning the probate court for appointment of a temporary guardian in violation of the Adult Service Manual."  See D.E. 1 at ¶ 80a-e (Count V, gross negligence).

### c. MDHS and Michigan Statutory Governmental Immunity

With regard to immunity under state law, Defendant MDHS contends that, inter alia, MDHS (and by extension, the Adult Protective Services program) are immune under Mich. Comp. Laws §691.1407(1). The statute states:

> Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided in this act, this act does not modify or restrict the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed.

See also Jones v. Muskegon County, 625 F.3d 935, 947 (6th Cir. 2010) ("Michigan's Governmental Tort Liability Act provides that a governmental agency, such as a county, is immune from liability where it is engaged in the exercise or discharge of a governmental function.") (citation and quotation omitted).

Plaintiffs do not dispute this rule, but instead claim that it bars only claims of negligence and does not apply to intentional torts.[29] D.E. 40 at 21. Plaintiffs are mistaken. Michigan Compiled Law § 691.1407(3) does indeed specify that § 691.1407(2)'s immunity does not apply to intentional torts. However, § 691.1407(3) affects only the immunity granted to individual employees of government agencies under § 691.1407(2). It does not affect the immunity granted

---

[29] It is clear that the MDHS falls within the definition of governmental agency. See Mich. Comp. Laws § 691.1401(1)(b)-(d); McGhan v. Kalkaska County Dep't of Human Servs., No. 08-1113, 2009 WL 2170151, at *11 & n.6 (W.D. Mich. July 20, 2009) (holding that the Michigan Department of Human Services is entitled to immunity under Mich. Comp. Laws § 691.1407). It is also clear that the MDHS here was acting in the exercise of its government functions. See Mack v. City of Detroit, 649 N.W.2d 47, 57 (Mich. 2002) (defining the term). Plaintiffs do not dispute that MDHS is a government agency and that it was exercising its government functions in its actions relative to Jena Kolley.

to the government agencies themselves under § 691.1407(1).  See, e.g., EBI-Detroit, Inc. v. City

of Detroit, 279 F. App'x 340, 351 (6th Cir. 2008) ("All Michigan cases agree that government

agencies are immune from liability for intentional torts."); John Doe (1-3) v. Dearborn Pub.

Schs., No. 06-12369, 2008 WL 896066, at *8 (E.D. Mich. Mar. 31, 2008) ("there is no exception

in the governmental immunity statute, [Mich. Comp. Laws] § 691.1407(1), for intentional

torts").

Accordingly, Defendant MDHS is entitled to immunity on all of Plaintiffs' state-law

claims.

### 5.   Defendant Pat Holmes, Priscilla Murrell,[30] & Hazel House

Apart from the arguments addressed in the Part III.C of this Opinion, Defendants

Holmes, Murrell, & Hazel House ("Hazel House Defendants") argue, inter alia, that (i) they are

not state actors for purposes of §1983, and that (ii) they are entitled to absolute social worker

immunity for several of the state-law claims alleged against them.

### a.   Section 1983 Claims – State Actor Analysis

Hazel House is a private, non-profit organization.  D.E. 33 at 9.  The complaint does not

allege otherwise.

Part III.D.3.b of this Opinion analyzes the state-actor issue relative to Defendant MORC.

As explained earlier, the Sixth Circuit employs three different tests; a successful result in any one

means that the defendant is a state actor.  With regard to MORC, the Court concluded that it did

not meet the public function test or the state compulsion test.  But the Court concluded that

because the complaint alleged "relevant indicia of state involvement" in the form of joint

---

[30] Although the caption of the case and party briefs spell Defendant Murrell's first and last names
differently, her signed affidavit uses this spelling.  See D.E. 56.

participation by MORC and law enforcement in interviewing Jena Kolley and physically removing her from her home, MORC's actions may have met the symbiotic relationship or nexus test.  See Molnar, 574 F. Supp. 2d at 785-86.  The same analysis applies to the Hazel House Defendants, but dictates a different result.

In contrast to the allegations against MORC, Plaintiffs' allegations against the Hazel House Defendants do not include joint activity with law enforcement.  Thus, the Hazel House Defendants do not meet the symbiotic relationship or nexus test, and are not state actors.  An unpublished Sixth Circuit opinion reinforces this understanding.  In Reguli v. Guffee, 371 F. App'x 590, the court evaluated the state action question with regard to a program similar in many ways to the Hazel House.  In Reguli, the defendant was the director of a private non-profit counseling program that the juvenile plaintiff was required to attend by court order.  Id. at 600. The court concluded that the defendant did not meet any of the state-actor tests.  Significantly, the defendant did not meet the nexus test despite receiving the juvenile as the result of a court order, occupying a guardianship role, and having reporting requirements back to the court.  Id. at 601-02.  See also Kirtley v. Rainey, 326 F.3d 1088, 1095 (9th Cir. 2003) (guardian appointed by state actor, paid by the state, subject to regulation by state law, and required to report back to court does not meet nexus test where she reports to the court as an independent investigator).

By the same logic, Hazel House does not meet the nexus test.  The complaint alleges that Hazel House is a "group home" and indicates that at some point Jena Kolley became a resident there.  One could also infer from the complaint that Hazel House employees exercised day-to-day care for Jena Kolley, and that employees had a reporting requirement to either the state or

the probate court.  D.E. 1 at ¶¶ 8, 37, 43, 97, 99-101.  Under <u>Reguli</u>, these allegations are insufficient to meet the nexus test.[31]  Thus, the Hazel House Defendants are not state actors.

Plaintiffs argue against this result, contending that (i) Hazel House meets the public function test, and (ii) that because the state action question requires a "functional" analysis of the agency's activities and the degree of cooperation between the agency and the state, the question cannot be answered without full discovery.  D.E. 41 at 14-15 (Plaintiffs' response to Hazel House Defendants' motion).  The Court rejects both arguments.

First, in support of Plaintiffs' contention that Hazel House meets the public function test, Plaintiff cites a single case -- <u>West v. Atkins</u>, 487 U.S. 42 (1988), the seminal case describing the public function test.  In <u>West</u>, the Court held that private physicians under contract with the state to provide medical services to inmates as a state-prison hospital were state actors.  The Court relied in particular on the state's obligation under federal constitutional and state law to provide adequate medical care to individuals it incarcerated.  <u>Id.</u> at 54-56.

Plaintiffs do not explain how <u>West</u> applies to the facts of this case.  Further, subsequent decisions explain why the <u>West</u> result is not warranted here.  Under the public function test, a private party is a state actor if he exercises powers "traditionally reserved exclusively to the state."  <u>Chapman v. Higbee Co.</u>, 319 F.3d 825, 833 (6th Cir. 2003) (en banc), <u>cert. denied</u>, 542 U.S. 945 (2004).  "The public function test has been interpreted narrowly.  Only functions like holding elections, exercising eminent domain, and operating a company-owned town, fall under this category of state action."  <u>Id.</u>  Thus, courts have concluded that actions like performing

---

[31] It is noteworthy that although the complaint pleads that other private-entity Defendants (Care House employees and MORC) acted under color of state law, <u>see</u> D.E. 1 at ¶ 72, it does not allege the same against the Hazel House employees.  Even if it had, however, the bare assertion of a legal conclusion does not meet the requisite pleading standard.  <u>See</u> <u>Sofamor</u>, 123 F.3d at 400.

forensic interviews and providing court-ordered counseling services do not meet the standard. See Reguli, 371 F. App'x at 600; Molnar, 574 F. Supp. 2d at 784. There are no allegations explaining how Hazel House's "group home" services or other duties are powers traditionally reserved exclusively to the state. Accordingly, the complaint fails to allege, much less establish, that Hazel House meets the public function test.

Second, in order to state a claim, plaintiffs must plead that defendants to a §1983 claim are state actors. A court is entitled to examine at the pleading stage whether this requirement is met and to dismiss claims that fail to do so. See, e.g., Gritton v. Disponett, 332 F. App'x 232, 237-38 (6th Cir. 2009) (evaluating the allegations of the complaint and affirming district court's Rule 12(b)(6) dismissal of claims against a party because complaint allegations fail to satisfy state-actor tests). A court looks to the allegations in the complaint to see if they would meet a state-actor test. Id. Thus, it is proper for this Court to conduct a state-actor analysis prior to discovery.

For these reasons, the complaint does not allege that Hazel House was a state actor, and thus, does not state any §1983 claims against the Hazel House Defendants.

### b.  State Tort Claims -- Immunity

The Hazel House Defendants claim social worker immunity for several state-law claims: Count VIII (defamation), Count IX (false imprisonment), Count X (abuse of process), and Count XI (intentional infliction of emotional distress).[32]  Again, the analysis in Part III.D.3.d of this Opinion, analyzing the MORC Defendants' claim of absolute immunity against the state tort claims, is applicable. As explained previously, the claims that this Court has concluded were

---

[32] Defendant Holmes does not argue that she is entitled to immunity related to the battery claim (count VII).

insufficiently pled – false imprisonment and intentional infliction of emotional distress – lack sufficient clarity for this Court to conduct an immunity analysis.

With regard to the remaining claims for which the Hazel House Defendants claim social worker immunity – defamation and abuse of process – the Court can reach a conclusion on social worker immunity.  The complaint alleges the same actions by the Hazel House Defendants as the basis for both claims.  The allegations are that (i) Priscilla Murrell (or an unidentified employee of Hazel House) told Defendant Saltzman (Kolley's guardian at litem) and others that "Plaintiff Joseph Kolley requested that his daughter . . . . be given a 'bikini wax' or otherwise have her public hair shaved," and that (ii) Saltzman "falsely republished the defamatory statements to the [probate court]."  See D.E. 1 at ¶¶ 99-103, 115(c).

As this Court has previously noted, "[s]ocial workers are granted absolute immunity from civil litigation arising out of their work as 'advisors and agents' of the probate court."  Beauford, 711 N.W.2d at 786.  Further, oversight of the social worker by the court is required.  Martin, 544 N.W.2d at 655.  The alleged actions of the Hazel House Defendants clearly qualify.  The alleged actions, taken by social workers, all occurred well after the probate court's oversight of Jena Kolley's custody began.  The alleged actions concerned the testimony during a particular hearing of the probate court.  Under these circumstances, the Hazel House Defendants are entitled to absolute social worker immunity pursuant to Beauford and Martin.

Accordingly, the Hazel House Defendants are entitled to dismissal of Count VIII (defamation) and Count X (abuse of process), but are not entitled to dismissal of Count IX (false

imprisonment) and Count XI (intentional infliction of emotional distress), based on social worker immunity.[33]

## IV.   Conclusion

For the foregoing reasons, the Court orders as follows:

A.  All claims as to all Defendants are dismissed without prejudice, with the following exceptions:

    1.  The false imprisonment claim (Count IX) against MORC Defendant Gipperich is not dismissed.

    2.  The gross negligence claim (Count V) against Defendant Fincher is not dismissed.

    3.  The negligence claim (Count VI) against the MORC Defendants is not dismissed.

    4.  The following claims are dismissed with prejudice:

        a.  all claims against Defendant Saltzman, because, as a guardian ad litem, she is immune from suit;

        b.  the abuse of process claims (Count X) against the MORC Defendants, because they are entitled to social worker immunity;

        c.  all federal claims against Defendant MDHS and Defendant Fincher in her official capacity, because Defendants are immune under the Eleventh Amendment   All state-law claims against Defendant MDHS, because Defendant is entitled to immunity under the Eleventh Amendment and state statute.  The abuse of process claim (Count X) against Defendant Fincher, because Fincher is entitled to social worker immunity; and

        d.  all federal claims against the Hazel House Defendants, because Defendants are not state actors.  The defamation and abuse of process claims (Count VIII

---

[33] This Opinion does not include a section on Defendant Schuster because Schuster does not raise any arguments that require independent consideration separate from this Court's analysis in Part III.C of this Opinion.  The Court notes that, despite Schuster being listed in the complaint caption of the case as "an agent of MORC,"  D.E. 1 at 1, the parties' briefs agree that Schuster is not affiliated with MORC and is an employee of Care House.  The body of the complaint does not mention MORC in connection with Schuster; it characterizes Schuster as "an individual and the forensic evaluator that conducted an initial interview on Plaintiff Jena Kolley."  Id. at ¶ 11.

and Count X) against the Hazel House Defendants, because Defendants are entitled to social worker immunity.

B. The following motions are granted:

1. The motion to dismiss by Defendant Shirley Saltzman (D.E. 20);

2. The motion for judgment on the pleadings (or alternatively, for summary judgment) by Defendant Tricia Schuster (D.E. 27);

3. The motion to dismiss by Defendant John Neph (D.E. 31); and

4. The motion for judgment on the pleadings (or alternatively for summary judgment) by Defendants Hazel House, Priscilla Murrell, and Pat Holmes (D.E. 33).

C. The following motions are granted in part and denied in part:

1. The motion to dismiss (or alternatively for summary judgment) by MORC and Edward Kiefer, Lori Mathes, Susan Thomas, Lea Antella, and Susan Gipperich (D.E. 16), which is (i) denied in part as to the negligence claim (Count VI) as to all MORC Defendants, (ii) denied in part as to the false imprisonment claim (Count IX) against Defendant Gipperich, and (iii) granted in all other respects; and

2. The motion to dismiss (or alternatively for summary judgment) by Defendants MDHS and Marcie Fincher (D.E. 34), which is (i) denied in part as to the gross negligence claim (Count V) against Defendant Fincher, and (ii) granted in all other respects.

D. As to the claims that are dismissed as insufficiently pled –

- Count I (right to family association);
- Count II (due process);
- Count IV (ethnic discrimination);
- Count VII (battery);
- Count IX (false imprisonment);
- Count XI (intentional infliction of emotional distress); and
- Count X (abuse of process) as to Defendant Neph

this dismissal is without prejudice to Plaintiffs filing an amended complaint within 30 days of the date of entry of this order.  Plaintiffs are only permitted to amend the claims which this Opinion concludes were insufficiently pled; this includes only the counts specified above.  Failure to file

a timely amended complaint as to these claims will result in the dismissal with prejudice in favor

of Defendants on these counts.

     SO ORDERED.

                                s/Mark A. Goldsmith
                                MARK A. GOLDSMITH
                                United States District Judge

Dated:  March 31, 2011

## CERTIFICATE OF SERVICE

     The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 31, 2011.

                                s/Deborah J. Goltz
                                DEBORAH J. GOLTZ
                                Case Manager